## HAYNES *v.* MONTGOMERY.

### Opinion delivered November 28, 1910.

1. TRUST—PURCHASE OF WARD'S LAND BY GUARDIAN.—The law forbids a guardian to purchase the property of his ward directly or indirectly, and if he does so it permits the ward to have the sale set aside without a showing of actual fraud or injury. (Page 576.)

2. SAME—PURCHASE OF TRUST PROPERTY.—A purchaser of land from a guardian who had notice that the guardian had wrongfully acquired the land from his ward takes no better title than the guardian acquired. (Page 578.)

3. MARSHALING OF SECURITIES—WHEN REQUIRED.—Where a fraudulent purchaser of a ward's land conveyed it with other lands to an innocent mortgagee, the latter will be required to marshal the securities, so as to exhaust his remedy against the other tracts of land before resorting to the ward's land. (Page 579.)

Appeal from Randolph Chancery Court; *George T. Humphries,* Chancellor; reversed.

#### STATEMENT BY THE COURT.

This suit is by Leota Haynes, formerly Leota Arnold, for 80 acres of land, and for the canceling of certain conveyances of same, and for an accounting of the rents and profits.

Benjamin F. Arnold died in 1895 in Randolph County, leaving him surviving, appellant, his only child and heir, about five years old, who afterward married Haynes. His estate consisted of eight or ten head of cattle, a mule and wagon, some household goods, and the land in controversy, the northeast quarter of the northeast quarter of section 27, township 18 north, range 2 east, a part of which was in cultivation, and upon which a lien existed securing a debt of $100. He was taken sick at the house of defendant, Montgomery, and, realizing that death was near and desiring to provide for his motherless girl as far as possible, made an agreement with Montgomery to take his cattle and all other personal property and the rent on farm for that year and pay the mortgage off the land, to take care of and raise the child, and to turn the land over to her when she became 18 years of age. "Montgomery said the agreement was that he was to take the child, and personal property and rent for the land that year, was to pay the land out, and save it for the child, and turn it over to her when she was 18 years old. He

was also to school the girl all he could," was his statement to the brother of the dead man, and is not denied by him.

Montgomery was duly appointed guardian of plaintiff, and the mortgage was foreclosed after a default decree was rendered against her guardian and herself, without the appointment of a guardian *ad litem* for her, and said Montgomery, at the sale by commissioner, procured said land to be bought in for him and his benefit by J. H. Imboden. The land only brought $170, and the proof shows it to have been of the value of about $600. L. A. Imboden, the executor of J. H. Imboden, conveyed same to Spinnenwebber, Peters & Hanff to hold for Montgomery, and they conveyed it to him by deed, dated October 3, 1907.

In furtherance of his scheme to procure title to said land in violation of his trust and to defraud the plaintiff of her rights, he procured the removal of disability of minority of plaintiff on September 4, 1907, that she might make a deed to perfect the title, and induced her to convey it to said firm, on the advice of his attorney, who procured the order that they might convey it to him; and a quitclaim deed was made on the same day, September 4, 1907. The expressed consideration was one dollar, and nothing whatever was ever paid plaintiff for said land.

This guardian had always, while plaintiff was growing up, spoken of this land as his, and told her she had no real interest in it; that he wanted to sell it and Mont. Armstrong would not buy it until she had the order of court removing her disability of minority and made the deed. The defendant, Montgomery, was in possession of the land from the time of Ben Arnold's death until January, 1908, and collected from $40 to $70 per year rent therefor.

The defendant, M. R. Armstrong, claims to be an innocent purchaser of this land from W. J. Montgomery, guardian of the plaintiff. The proof shows that he purchased it from him knowing that he was her guardian, and that the title to it was held by Spinnenwebber and Peters for him in violation of his trust as such guardian, and, after refusing, as Montgomery states, to buy it until plaintiff's disabilities were removed and a deed made from her, that he asked for the papers and examined the records, as he was interested in them and wanted them included in the abstract. This was all done before he paid the purchase money, or any part of it, on October 3, 1907, and before the

deed was executed by said Spinnenwebber and Peters to said Montgomery on that date. He required them to make affidavit before him as county clerk, showing, among other things, that when Imboden conveyed it to them "it was agreed and understood at the time that the said lands were to be the property of W. J. Montgomery." He only paid $675 for the lands, and the proof shows the value at $20 per acre, or $1,600.

M. R. Armstrong conveyed this land to A. J. Witt as trustee to secure the payment of a loan of $500 from Sloan, along with other lands, and but $250 has been paid on said indebtedness. Sloan, for whose benefit this deed of trust was made, claims to have been without knowledge of any of these matters, and an innocent purchaser or mortgagee. The complaint was dismissed for want of equity, and plaintiff appealed.

*W. A. Cunningham* and *T. W. Campbell,* for appellant.

1. The court of equity is a special guardian of the rights of minors, and will set aside judgments and decrees of any of the courts for fraud and where equity demands it. 54 Ark. 539; 50 Ark. 458; 68 Ark. 492; 73 Ark. 440; 73 Ark. 281; 75 Ark. 425. Montgomery occupied a trust position totally inconsistent with the position of purchaser, and would not, as a matter of public policy, be allowed to purchase. 20 Ark. 401; 23 Ark. 626; 26 Ark. 446; 30 Ark. 48; 33 Ark. 587; 42 Ark. 28; 41 Ark. 264. The removal of appellant's disabilities of minority was procured by fraud and by suppression of facts. Montgomery was under the obligation to make the fullest disclosure to the court of all the facts and circumstances connected with the transaction; but whether or not this proceeding stands or falls, the deed from the ward is presumptively fraudulent and void. 9 Am. St. Rep. 593; 117 Am. St. Rep. 250; 89 *Id.* 302.

2. Armstrong was not an innocent purcahser. One who has notice of facts sufficient to put a prudent man upon inquiry has notice of all he might have learned by such inquiry. 23 Ark. 744; 58 Ark. 453; *Id.* 91; 14 Ark. 69; 32 Ark. 251; 9 Am. St. Rep. 595. The fact that he paid Montgomery nearly $1,000 less than the land was really worth is one of the strongest of the many evidences that he knew of appellant's rights in

the land. 58 Mo. 235; 25 Wis. 573; 97 N. C. 367; Eaton on Equity, 131.

*McCaleb & Reeder* and *Witt & Schoonover,* for appellees.

1. Both the decree of foreclosure and the decree removing appellant's disabilities of minority are valid as against collateral attack. 72 Ark. 601; *Id.* 299; *Id.* 101; 63 Ark. 1; 73 Ark. 27; 75 Ark. 175-80; 76 Ark. 465; 23 Ark. 121; 31 Ark. 74; 24 Ark. 122; 50 Ark. 338; 57 Ark. 49; 28 Ark. 171; 34 Ark. 642. While in a foreclosure proceeding a decree against a minor defendant without a defense by a guardian is voidable on appeal or other direct attack, yet it is not subject to collateral attack. 18 Ark. 53; 25 Ark. 52; 49 Ark. 397; 56 Ark. 137; 50 Ark. 190; 23 Cyc. 1062; *Id.* 1070; 1 Black on Judgments, § 252; *Id.* § 246; 92 Ark. 611; 23 Cyc. 1072; 71 Ark. 330; 72 Ark. 299.

2. If this be held to be a direct proceeding, then appellant has joined in her complaint two actions which can not properly be joined in one action, and a failure to sustain either is fatal to her case.

3. In order to set aside a judgment or decree for fraud, the proof of fraud must be satisfactory and convincing. 73 Ark. 286. If the proof had been sufficient to show that fraud had been committed, it is not sufficient to show that Armstrong had any connection with it, and he, being an innocent purchaser, is entitled to be protected as such. The findings of the chancellor are clearly sustained by the preponderance of the testimony, and ought to be sustained by this court. 89 Ark. 132; *Id.* 309; 90 Ark. 166; 91 Ark. 69; *Id.* 149; *Id.* 246; *Id.* 268; *Id.* 299.

KIRBY, J., (after stating the facts). Was Montgomery, the guardian, under such disability to purchase these lands as that they will be charged with a trust in his hands and those of his vendee with notice?

In *Hindman* v. *O'Connor,* 54 Ark. 633, this court said: "As a general rule, a party occupying a relation of trust or confidence to another is in equity bound to abstain from doing everything which can place him in a position inconsistent with the duty or trust such relation imposes on him or which has a tendency to interfere with such duty. Upon this principle no one placed in a situation of trust or confidence in reference

to the subject of a sale can be the purchaser, on his own account, of the property sold."

Continuing, quoting from *Imboden* v. *Hunter,* 23 Ark. 622: "The rule is not confined to persons who are trustees within the more limited and technical signification of the term, or to any particular class of fiduciaries, but applies to all persons in a situation of trust or confidence with reference to the subject of the purchase. It embraces all that come within its principle, permitting no one to purchase property and hold it for his own benefit where he has a duty to perform in relation to such property which is inconsistent with the character of a purchaser on his own account and for his individual use."

And further using the language in *Clements* v. *Cates,* 49 Ark. 242: "The law forbids a trustee and all other persons occupying a fiduciary or *quasi*-fiduciary position from taking personal advantage touching the things or subject as to which such fiduciary position exists. * * * If such a person acquires an interest in property as to which such relation exists, he holds it as a trustee for the benefit of those in whose interest he was prohibited from purchasing, to the extent of the prohibition." Continuing, with reference to the rule (page 635): "Its applicability to guardians and wards and persons standing in like relation is apparent. Judge Story, in speaking on this rule, says: 'In the next place, as to the relation of guardian and ward. In this most important and delicate of trusts the same principles prevail, and with a larger and more comprehensive efficiency. It is obvious that during the existence of the guardianship the transactions of the guardian can not be binding on the ward if they are of any disadvantage to him; and indeed the relative situation of the parties imposes a general inability to deal with each other. But courts of equity proceed yet further in cases of this sort. They will not permit transactions between guardians and wards to stand, even when they have occurred after the minority has ceased and the relation become thereby actually ended, if the intermediate period be short, unless the circumstances demonstrate in the highest sense of the term the fullest deliberation on the part of the ward and the most abundant good faith (*uberrima fides*) on the part of the guardian. For in all such cases the relation is still considered as having an undue influence upon the mind of the ward, and as virtually subsist-

ing, especially if all the duties attached to the situation have not ceased; as if the accounts between the parties have not been fully settled, or if the estate still remains in some sort under the control of the guardian. 1 Story on Equity. (13 ed.) § 317.' "

The wisdom of the rule was never better exemplified than in this case. Here the guardian, Montgomery, contrary to his express promise to the dying father of this ward, who left in his hands means for the payment of the note secured by a mortgage on these lands, and in violation of his duty as guardian to protect her interests, let the mortgage be foreclosed and procured the lands to be bought in for a grossly inadequate consideration and held for his benefit. As one of the witnesses said who had rented the land in 1899 and 1900: "Montgomery claimed to own the land. He said there was a mortgage on the place when Arnold died, and that he let it rock along and sell and bought it in himself." He has held possession of the lands from the death of Arnold in 1896 to January, 1908, and collected from $40 to $70 a year rent, and he has never charged himself as guardian therewith nor accounted therefor.

"The doctrine as to purchases by trustees, guardians, administrators and persons having a confidential character arises from the relation between the parties, and not from the circumstance that they have power to control the sale. The right to set aside the sale does not depend on its fairness or unfairness. To set aside the purchase it is not necessary to show that it is actually fraudulent or advantageous. If the trustee or other person having a confidential character can buy in an honest case, he may in a case having that appearance, but which may be grossly otherwise; and yet the power of the court, because of the infirmity of human testimony, would not be equal to detect the deception. It is to guard against this uncertainty and the hazard of abuse and to remove the trustee and other persons having confidential relations from temptation that the rule does and will permit the *cestui que trust* or other person to come at his option and, without showing actual injury or fraud, have the sale set aside." *Hindman* v. *O'Connor*, 54 Ark. 640, and cases cited.

W. J. Montgomery comes within this rule, and appellant is entitled to an accounting for rents and profits; and if M.

R. Armstrong purchased with knowledge of the conditions and relation, he is in no better position than his vendor. Was he an innocent purchaser? He knew that Montgomery was guardian of plaintiff, that the relation was still in existence, and the accounts not closed; that she had lived at his home as a member of his family from early infancy, and was under his influence; that she inherited this land from her father; that it had been sold since Montgomery's appointment as guardian; that the title to same was held by another for him, and he had been in possession since his appointment as guardian; required the order of removal of the disability of the ward and a conveyance from her before purchasing, as Montgomery says, and examined the papers and record of it before paying any of the purchase price; knew that the order of court was procured through Montgomery's influence over his ward and the conveyance thereunder without consideration to the minor, and that she would have no benefit from the purchase money he was to pay. He can not be regarded an innocent purchaser. Clay Sloan, who loaned the $500, to secure which a deed of trust conveying these lands to A. J. Witt as trustee was made, appears from the evidence to be entitled to protection as an innocent purchaser or mortgagee. Since the cancellation of the deeds would not effect the proper relief, the lands will be charged with a trust in the hands of M. R. Armstrong for the benefit of appellant, and the securities marshaled, and all the other lands in the said Clay Sloan mortgage sold, and the proceeds applied to its discharge, before these lands can be resorted to under said mortgage; and, if it shall not thereby be paid in full, then appellant shall have the right to redeem upon payment of the balance.

The case is reversed, with directions to render a decree in accordance with this opinion, and for such other proceedings as are necessary and in accordance with law.